AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
для the
Western District of Arkansas
El Dorado Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT 315 SOUTH HUGHEY STREET, WALDO, COLUMBIA COUNTY, ARKANSAS, IN THE WESTERN DISTRICT OF ARKANSAS | No. ___1:22-cm-38___<br><br>**Filed Under Seal** |

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Aug 4, 2022
OFFICE OF THE CLERK

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*:
**See "Attachment A"**

located in the Western District of Arkansas there is now concealed *(identify the person or describe the property to be seized)*:
**See "Attachment B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
[×] evidence of a crime;
[×] contraband, fruits of crime, or other items illegally possessed;
[×] property designed for use, intended for use, or used in committing a crime;
[ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to violations, in the Western District of Arkansas, of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute and Distribution of Controlled Substances |
| 21 U.S.C. § 843(b) | Use of a Communication Facility in Furtherance of a Drug Trafficking Offense |
| 21 U.S.C. § 846 | Attempt and Conspiracy to Commit the above-listed offenses |

The application is based on these facts:   (See attached affidavit of TFO Johnie Caldwell, FBI)
[×]    Continued on the attached sheet.

[ ]    Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*(Appearing by telephone conference call at 415-527-5035)*
TFO Johnie Caldwell, Federal Bureau of Investigation
*Affiant*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035.

Date: 8-4-22

City and state: Texarkana, AR

_____
Judge's signature
Hon. Barry A. Bryant, United States Magistrate Judge, W. D. Ark.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) <br> THE PREMISES LOCATED AT 315 ) <br> SOUTH HUGHEY STREET, WALDO, ) <br> COLUMBIA COUNTY, ARKANSAS, ) <br> IN THE WESTERN DISTRICT OF ) <br> ARKANSAS ) | Case No. _____1:22-cm-38_____ <br><br> **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Johnie Caldwell, being duly sworn, depose and state the following:

### INTRODUCTION

1.  I am a Task Force Officer with the FBI and have been so assigned since 2008. In addition to my duties as a Task Force Officer, I am a Captain with the Magnolia Police Department and have been such employed since 1999. I am deputized with the Columbia County Sheriff's Department and 13th Judicial Drug Task Force. Prior to my assignment as a Task Force Officer with the FBI, I served as a patrolman, patrol sergeant, K9 officer, and criminal investigator. Since my assignment with the FBI, I am currently assigned to the El Dorado Resident Agency of the Little Rock Division within the FBI. During my assignment with the FBI, I have received training concerning and been involved in the investigations of numerous federal offenses to include federal drug trafficking offenses in violation of Title 21 U.S.C. § 841(a)(1) and conspiracy to do the same in violation of Title 21 U.S.C. § 846.

2.  Through my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods commonly used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities. I am familiar with the ways in which drug traffickers conduct their business -- including the method and means in which they: obtain, manufacture, import, and distribute narcotics; make drug payments and launder drug proceeds; and communicate with organizational members. My training and experience as a law enforcement officer,

and my conversations with state, federal, and law enforcement officers in other countries form the basis of the opinions and conclusions set forth below.

3. This affidavit is submitted in support of an application for a warrant authorizing a search of the following premises for evidence of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and/or 846:

    a. The entire premises located at 315 South Hughey St., Waldo, Columbia County, Arkansas, in the Western District of Arkansas, which premises is further described and depicted in 'Attachment A' hereto (hereafter the **"SUBJECT PREMISES"**).

    b. The items to be searched for and seized are described more particularly in 'Attachment B' hereto.

4. I am familiar with the information contained in this Affidavit from my own involvement in the investigation described herein, from my own training and experience as a law enforcement officer and drug investigator, and from my communications with other law enforcement officers regarding both this specific investigation and their own training and experience in similar criminal investigations. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that I believe are necessary or relevant to the existence of probable cause. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

5. As a result of the investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, to include violations of 21 U.S.C. §§ 841(a)(1), 843(b), and/or 846 are present at the **SUBJECT PREMISES**.

## INFORMATION REGARDING DRUG TRAFFICKING CRIMES AND RELATED FINANCIAL CRIME GENERALLY

6. From my training, experience, and participation in other drug and financial investigations involving wholesale and retail amounts of controlled substances, as well as the

knowledge and experience of other agents and police officers with whom your affiant has worked, your affiant knows:

a. That drug traffickers often generate large amounts of U.S. currency from their drug trafficking activities, and must have access to large amounts of currency to maintain and finance an on-going drug business. Drug traffickers often conceal this currency in locations such as their residences, "stash houses" (supplementary locations where drug inventory concealed, or where illicit drug transactions are facilitated or completed, commonly including residences or other structures belonging to or controlled by the drug trafficker and/or their co-conspirators, accomplices, or family members), businesses, safe deposit boxes, safes, or other locations where assets can be concealed. These locations may be in the name of the drug trafficker or in the name of relatives or close associates.

b. That in order to conceal profits from their drug trafficking activities drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities. That even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets, and exercise dominion and control over them.

c. That it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including at their residences, "stash houses", businesses, vehicles, storage units and/or other locations over which they maintain dominion and control.

d. That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records,

    passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are commonly maintained by drug traffickers at their residences and/or "stash houses", in their vehicles, at their businesses, in storage units or other locations over which they maintain dominion and control.

e. That drug traffickers often utilize electronic equipment such as cell phones, computers, text messaging devices, email, and currency counting machines, to generate, transfer, count, record and/or store the information described above. These items too are commonly maintained by drug traffickers at their residences and/or "stash houses", in their vehicles, at their businesses, in storage units or other locations over which they maintain dominion and control.

f. That drug traffickers often attempt to legitimize their profits from drug trafficking through various money laundering methods. To accomplish these goals, drug traffickers utilize methods including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations, and business fronts, and otherwise legitimate cash producing businesses.

g. That the sale of controlled substances generates quantities of United States currency in small denominations (commonly referred to as "street money"). It is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving trace residue of controlled substances on the "street money." Law enforcement agencies utilize dogs which are trained to detect and react to the odor of controlled substances and residue of controlled substances, and those trained dogs have reacted to drug tainted currency negotiated at banks and concealed in the residences of drug traffickers. It is common for drug dealers to separate their "street money" by denomination and put this currency in banded stacks in varying increments to facilitate quick counting. Courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish

        probable cause that there is a substantial connection between the questionable currency and drug transactions;

h.    That the currency transaction reports which are required to be completed and filed by financial institutions and businesses on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions or businesses. In order to avoid the filing of a currency transaction report, drug traffickers often "structure" their currency transactions, that is, arrange a cash transaction exceeding $10,000 into smaller transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

i.    That businesses engaged in the sale or lease of vehicles are required to file currency transaction reports for cash transactions which aggregate over $10,000. These businesses at times generate and/or accept large amounts of currency in the ordinary course of business. Certain of these businesses attempt to conceal the receipt of this currency by failing to file currency transaction reports or by structuring deposits of currency at financial institutions. Drug traffickers and others involved in criminal activity at times seek out businesses that fail to file currency transaction reports.

j.    That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other Federal, state, or local law enforcement agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences, "stash houses", and businesses.

k.    That drug traffickers commonly maintain cellular phones, computers, text messaging devices, books or papers which reflect the names, telephone numbers, addresses and/or electronic email addresses of their criminal

associates in the trafficking organization. These items are also commonly maintained by drug traffickers at their residences and/or "stash houses", in their vehicles, at their businesses, in storage units or other locations over which they maintain dominion and control.

l. That drug traffickers often take or cause to be taken photographs and videos of themselves, their associates, their assets and their product. That these traffickers usually maintain these photographs and videos in their possession, or at their residences and/or "stash houses", or within their computers, cellular phones, vehicles, and/or other locations over which they maintain dominion and control;

m. That drug traffickers commonly keep in their residences items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

n. That it is common for drug traffickers to maintain, at their residences, "stash houses", and places of business, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records (drug ledgers) to show balances due for drugs sold in the past ("pay"), and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers, and keep them immediately available in order to efficiently conduct their drug trafficking business.

o. That it is also common for drug traffickers to make use of wire transfers, cashier's checks, and money orders to pay for expenses associated with

       services to facilitate their illegal activities. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained at traffickers' residences, "stash houses", places of business, and/or other locations over which they maintain dominion and control.

p.    That drug traffickers often travel or pay and arrange for others to travel in furtherance of their drug trafficking activities including traveling to transport drugs and to transport currency derived from and/or related to the drug trafficking activities. Such travel necessarily results in the generation of various travel documents for the traveler, which typically are also kept in their residences, places of businesses and/or their vehicles. In addition, traffickers who travel or who contract others to travel on their behalf often communicate with their sources of supply prior to, during and after their travel. Drug Traffickers typically leave records of these communications in various places including but not limited to their cellular telephones, computers, text messaging devices, telephone answering machines, and handwritten notes. These communication records are usually found in traffickers' residences, "stash houses", places of business and/or their vehicles.

q.    That drug traffickers often keep the records and other items described above over very long periods of time, and may keep records in paper and/or electronic form.

## RELIABILITY OF THE CONFIDENTIAL HUMAN SOURCES

7.    A portion of the information and evidence described below has been obtained by a confidential source (hereinafter CS-1). CS-1 was operating at the direction of the Magnolia Police Department (MPD) in July and August 2021. In so doing, the CS-1 has made a controlled purchase of methamphetamine from WALTERS. CS-1 has a significant criminal history, including several felony property crime convictions. No promises as to any compensation or consideration have been made to CS-1 by agents. Agents believe the information provided by CS-1 to be credible and have corroborated portions of the information through physical surveillance and other investigative measures taken throughout the investigation.

## PROBABLE CAUSE

*Information Provided by CS-1 Regarding Christopher Walters and Marcus Jordan*

8.　　In July of 2021, an FBI Task Force Officer (TFO) interviewed CS-1 in reference to distribution of narcotics in Magnolia, Arkansas. CS-1 stated that WALTERS relocated from Watts, California, to Magnolia, Arkansas, in 2016 and is a member of the PJ Watts Crip criminal gang. CS-1 further indicated that WALTERS is a large-scale distributer of methamphetamine, ecstasy, pills, and marijuana. CS-1 stated that on multiple occasions he/she had observed, among other things, firearms, large quantities of pills, and bricks of methamphetamine at WALTERS residence, 1119 Linda Street, Magnolia, Arkansas. Additionally, CS-1 stated that WALTERS receives shipments of narcotics through the US mail from a source of supply (hereinafter SOS) located in California, who WALTERS referred to as "Main." CS-1 advised that an unknown black female, Dawnisha (LNU) (later fully identified as Dawnisha JORDAN), from California, who flies to and from Arkansas, is a money courier for WALTERS. CS-1 identified WALTERS telephone number as 870-949-9494 (hereinafter "TT#3") and stated that WALTERS prefers to communicate through Apple's "Facetime" video calling feature. CS-1 stated WALTERS has an unknown black male, Marcus (LNU) (later fully identified as Marcus JORDAN), who works at Tyson in Hope, that sells and holds narcotics for WALTERS.

*Identification of the Subject Premises as Marcus Jordan's Residence*

9.　　Agents have observed Marcus JORDAN driving a white Dodge Charger on more than one occasion, during the course of the investigation described herein. A query of Arkansas Department of Motor Vehicle records regarding that white Dodge Charger, which bears Arkansas license plate number 834YDT, identified its registered owner as Marcus JORDAN, with an address of 315 Hughey Street Waldo, Arkansas 71770 (the address of the **SUBJECT PREMISES**). Moreover, agents have observed the same white Dodge Charger parked at the **SUBJECT PREMISES** on a number of occasions during the course of this investigation.

*Information Provided by Reliable Confidential Source of Information*

10. On or about May 20, 2022, a reliable confidential source of information began providing the FBI significant evidence indicating that WALTERS, and several associates, including Marcus JORDAN, were continuing to distribute various illegal drugs in and around Columbia County, Arkansas. The following represents a portion of the information obtained through the reliable confidential source as it relates to the use of the **SUBJECT PREMISES** in the furtherance of drug trafficking:

*June 7, 2022, Distribution of Methamphetamine by WALTERS*

11. On June 7, 2022, WALTERS and others, including Marcus JORDAN, Lacadran THOMAS (a/k/a "Mooney") and Dawnisha JORDAN (A/K/A "Red") (hereinafter "D. JORDAN") arranged and conducted an illicit drug transaction. According to the above-referenced reliable source of information, the transaction began when, during a June 7 conversation between THOMAS and WALTERS, THOMAS said 'Alright, uhh, made a little play wolla go and hell, need that back (or possibly bag)'. From my training and experience in this and similar investigations, I interpret THOMAS' statements as meaning that THOMAS had completed a drug transaction and was requesting a resupply from WALTERS. In response to that request by THOMAS, the same source of information indicates that WALTERS told THOMAS to let him call someone, which I interpret to mean that WALTERS would begin to arrange the requested resupply.

12. Not long after the above-described conversation between WALTERS and THOMAS, the same reliable confidential source of information indicates that WALTERS contacted JORDAN. During an exchange with JORDAN, which took place shortly thereafter, the same source of information indicates that WALTERS told JORDAN that 'the boy Mooney was trying to get a half.' From my training and experience, including in this specific investigation, I interpret this as WALTERS telling JORDAN that THOMAS was attempting to obtain a half-pound quantity of methamphetamine. The same source of information further indicates that WALTERS then instructed JORDAN to take the methamphetamine to another location, and that THOMAS would walk over and pay JORDAN $1,250.

13.     Later on June 7, the same reliable confidential source of information indicates that JORDAN told WALTERS 'Yea, I was calling tell you I was at, uh, waiting on dude but shit I'm getting ready to leave hell.' From training and experience, I interpret this statement by JORDAN to mean that JORDAN had arrived at the stated location, but that THOMAS was not present. The same reliable source of information indicates that WALTERS replied to JORDAN 'Yea, drop that shit over my other house he can pull up over there and get it.' From training and experience, I interpret this to mean that WALTERS was instructing JORDAN to take the methamphetamine to another residence controlled by WALTERS, where THOMAS could pick it up. Thereafter, the same source of information indicates JORDAN told WALTERS 'well I gotta go back in there and get it out. It's in the house,' which I interpret to mean that JORDAN would have to go back inside a residence in order to retrieve the methamphetamine.

14.     Around the same time as the exchange between WALTERS and JORDAN described in the preceding paragraph, agents saw (through a covert remote surveillance device installed in the vicinity) a man known to them as JORDAN arrive at 923 W. Monroe St. Magnolia, Arkansas. JORDAN was seen entering the residence and then coming out again. Shortly thereafter, JORDAN was observed re-entering the residence and again coming out, this time with a large bulge in his left front pocket. JORDAN was then observed departing in his vehicle.

15.     The above-referenced reliable confidential source of information indicates that, around the same time on June 7, WALTERS told D. JORDAN that JORDAN was bringing 'something good' to her residence. The same source of information indicates that WALTERS told D. JORDAN, 'Just go straight to the house - make sure you go straight to the house. When you get back from him, I'm gonna have the black boy Mooney come over there gonna give you twelve fifty.' From training and experience, and familiarity with this particular investigation, I believe this was WALTERS directing D. JORDAN to provide the methamphetamine to THOMAS and collect $1,250 from him.

16.     The above-referenced reliable confidential source of information further indicates that, not long thereafter, JORDAN asked WALTERS if D. JORDAN was at the residence, and that WALTERS told JORDAN she was on the way.

17.     Thereafter, through a different remote surveillance device installed in the vicinity of 1119 Linda St., agents also saw JORDAN arrive at that residence. JORDAN was seen entering 1119 Linda St. for a short time, coming out again, and departing in his vehicle.

*June 15, 2022, Distribution of Methamphetamine by WALTERS*

18.     On June 15, 2022, WALTERS and others, including Marcus JORDAN and John GRISSOM (a/k/a "Lil John") arranged and conducted an illicit drug transaction. According to the above-referenced reliable source of information, the transaction began when, during a June 15 conversation between GRISSOM and WALTERS, GRISSOM said 'two left or whatever. Prolly gonna need bout like, um..... at least bout five more'. From my training and experience in this and similar investigations, I interpret GRISSOM's statements as meaning that GRISSOM had two (2) pounds of methamphetamine on hand and was requesting a resupply of five (5) additional pounds from WALTERS. In response to that request by GRISSOM, the same source of information indicates that WALTERS told GRISSOM 'I'm gonna have him come drop em off over there', which I interpret to mean that WALTERS would begin to arrange the requested resupply.

19.     Not long after the above-described conversation between WALTERS GRISSOM, the same reliable confidential source of information indicates that WALTERS contacted JORDAN. During the conversation with JORDAN, the same source of information indicates that WALTERS told JORDAN that he was 'trying to get you to take five of them thangs to the house for me.' WALTERS goes on to tell JORDAN that 'once you get them there I'm going to tell him to come get them.' From my training and experience, including in this specific investigation, I interpret this as WALTERS telling JORDAN to take five (5) pounds of methamphetamine to another location from the **SUBJECT PREMISES** – I believe for the purposes of resupplying GRISSOM.

20.     Later that same day, the same reliable confidential source of information indicates that GRISSOM and WALTERS again discussed the distribution of methamphetamine. During this conversation GRISSOM indicated that since his last communication with WALTERS, he had obtained a buyer for the two (2) pounds he previously indicated he had on hand, 'every last one of them muther fuckers gone now. I got another nigga he want like two of em like right

now.' From my training and experience, including in this specific investigation, I interpret this as GRISSOM indicating he may in fact need to be resupplied more than the original five (5) pounds he requested from WALTERS.

21. Shortly thereafter, the above-referenced reliable confidential source of information further indicated that WALTERS again contacted JORDAN. During this communication WALTERS asked JORDAN how much methamphetamine was left and then said "its nine and a half of one? give em that, give em the nine, just leave the half of right there" JORDAN then agrees to deliver the methamphetamine. From my training and experience, including in this specific investigation, I interpret this as WALTERS directing JORDAN to take nine (9) pounds of methamphetamine to another location from the **SUBJECT PREMISES** – I believe for the purposes of resupplying GRISSOM.

22. Subsequently, according to the aforementioned reliable confidential source of information, GRISSOM spoke with WALTERS. During this conversation GRISSOM asked WALTERS 'Am I taking Red change?" to which WALTERS replied in part 'yea you can take Red change.' From my training and experience, including in this specific investigation, I interpret this as WALTERS telling GRISSOM to pay D. JORDAN a/k/a "Red" for the procurement of the aforementioned nine (9) pounds of methamphetamine. Furthermore, according to the same reliable confidential source of information, WALTERS contacted D. JORDAN and said "Alright nigga fixing to bring you twenty-four, or thirty."

23. A short time after the conversations described in the preceding paragraphs, agents saw (through a covert remote surveillance device installed in the vicinity) a man known to them as JORDAN arriving at 923 W Monroe Steet, Magnolia, Arkansas. JORDAN was then observed removing a large white bag from the trunk of his white Dodge Charger, Arkansas license plate number 834YDT and taking it inside the residence. Soon thereafter, agents observed JORDAN exit the residence carrying a white bag which now appeared to contain less contents. JORDAN then departs in the aforementioned white Dodge Charger. At approximately the same time, through the use of a separate covert remote surveillance device, agents observed GRISSOM arrive at 1119 Linda St. driving a white Toyota Camry, Arkansas license plate number 234ZFX.

GRISSOM is then observed entering the residence at 1119 Linda St. and departing in the white Toyota Camry a short time later.

24.     At approximately the same time, the aforementioned reliable confidential source of information indicated that JORDAN contacted WALTERS and said 'All 9 is in the white trash bag on the couch where he had put the money the other day.' Soon thereafter, WALTERS contacted GRISSOM and said 'It ain't, it ain't eight its nine' to which GRISSOM replied 'Alright I'm on my way, I'm over at Reds right now.' Based on my training and experience, I interpret this as WALTERS telling GRISSOM that the nine (9) pounds of methamphetamine is ready for pick up and GRISSOM is telling WALTERS he is at providing payment to D. JORDAN's at 1119 Linda St. According to the same reliable confidential source of information, in a later conversation, GRISSOM told WALTERS 'hey it was um, twenty-seven in there, twenty-seven bands.' I interpret this to mean GRISSOM provided $27,000 to D. JORDAN.

25.     Later, through the use of covert remote surveillance, agents observed the aforementioned white Toyota Camry, driven by GRISSOM, arrive at the 923 W. Monroe St. GRISSOM exits his vehicle and enters the residence. Shortly thereafter, GRISSOM is observed exiting the residence carrying a grocery bag and departs in his vehicle. Subsequently, through the use of physical surveillance, agents observed the white Camry arrive at the Preston Apartments located at 436 Renfroe Street Magnolia, Arkansas. Based on information obtained during the course of this investigation, as well as CS reporting, GRISSOM is known to reside in apartment number 414 of the Preston Apartments.

*July 10, 2022, Relocation of Controlled Substances to the Subject Premises*

26.     On July 10, 2022, Agents conducted remote and electronic surveillance of the transportation of illegal drugs involving WALTERS and JORDAN to the **SUBJECT PREMISES** from 923 W. Monroe St. Magnolia, Arkansas. According to the above-referenced reliable source of information, the transaction began when, during a July 10 conversation between an unknown female and WALTERS, WALTERS said 'I just front oh boy he followed me over the house right now, so I'm fixin to clear it out and come get you'. Unknown female asked 'ok, so you fixing to go back over to the trap?'. WALTERS said 'This really ain't no trap, I just let certain niggas pull up on me. I don't like moving nothing, I feel they will pull me over and that will be the day I'm dirty. So I be letting

these niggas do it. The nigga that doing it he got license, good car, and all that stuff.. Motherfuckers won't even know he got it'. From my training and experience in this and similar investigations, I interpret this as WALTERS telling the unknown female that WALTERS was having someone—whom I believe to be JORDAN, based on my knowledge and experience in this case—move all the controlled substances then stored at 923 W. Monroe St., Magnolia, Arkansas to another location—I believe the **SUBJECT PREMISES**, based on agents' knowledge that it is JORDAN's residence.

*July 11, 2022, Storage of Controlled Substances at the Subject Premises*

27.     On July 11, 2022, WALTERS arranged to come to the **SUBJECT PREMISES**, to meet with JORDAN to pick up several pre-rolled marijuana cigarettes. Marijuana is a Schedule I controlled substance, under federal law. According to the above-referenced reliable source of information, the transaction began when, during a July 11 conversation between JORDAN and WALTERS, WALTERS said 'yeah, you know the pre-rolls, them little joints, little joint things. They in the backpack. Pills right there too' WALTERS tells JORDAN 'I'm gonna come get like 5 pre-rolls'. From my training and experience in this and similar investigations, I know that persons involved in the sale and use of marijuana often refer to prepared marijuana cigarettes as "joints," or "pre-rolls." I interpret the above-described exchange as WALTERS telling JORDAN that WALTERS is on his way to the **SUBJECT PREMISES**, JORDAN's residence, to pick up five (5) marijuana cigarettes, and that the pre-rolled joints are being stored inside a backpack with pills inside the **SUBJECT PREMISES**.

28.     During the July 11, 2022, a second conversation between WALTERS and JORDAN, JORDAN indicated that WALTERS had a large amount of pills in multiple bags at the **SUBJECT PREMISES**. According to the above-referenced reliable confidential source of information, during the conversation between JORDAN and WALTERS, JORDAN said 'hey do you got a big bag in here with 50 pills in it'. WALTERS said 'nope, gotta count them out'. From my training and experience in this and similar investigations, I interpret this as indicating that WALTERS had multiple bags with pills in them, stored at the **SUBJECT PREMISES**, and that JORDAN needed 50 of the pills. A short time later, Agents observed WALTERS' white Dodge Durango at the **SUBJECT PREMISES**.

*July 13, 2022, Storage of Controlled Substances at the Subject Premises*

29.     On July 13, 2022, WALTERS arranged with JORDAN to come to the **SUBJECT PREMISES**, to meet with JORDAN to pick up methylenedixoymethamphetamine (MDMA, commonly called "ecstasy") from the **SUBJECT PREMISES**. MDMA is a Schedule I controlled substance, under federal law. According to the above-referenced reliable source of information, conversation between JORDAN and WALTERS, WALTERS said 'I need 3 skittles. I'm gonna come that way'. From my training and experience in this and similar investigations, I know that persons involved in the sale and use of MDMA often refer to the drug, which is commonly found in the form of small, colored pills, as "Skittles." I interpret this exchange as WALTERS telling JORDAN that he was coming to the **SUBJECT PREMISES**, JORDAN's residence, to pick up MDMA, that was being stored at the **SUBJECT PREMISES**.

30.     The above-referenced reliable confidential source of information further indicates that, not long thereafter, JORDAN asked WALTERS if D. JORDAN was at the residence, and that WALTERS told JORDAN she was on the way.

## CONCLUSION

31.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843(b) and/or 846 (Distribution of, and Possession with Intent to Distribute, Controlled Substances, Use of a Communication Facility in the Distribution of Controlled Substances, and Attempts and Conspiracy commit the aforementioned offenses) described in 'Attachment B' hereto are currently located within and upon the **SUBJECT PREMISES**.

32.     I, therefore, respectfully request that attached warrant be issued for the locations described in 'Attachment A,' and authorizing the search and seizure of the items listed in 'Attachment B'.

Respectfully submitted,

(Appearing by telephone conference call at 415-527-5035) *BAD*
Task Force Officer Johnie Caldwell
Federal Bureau of Investigation

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035 on this 4th day of August, 2022.

_____
HON. BARRY A. BRYANT
United States Magistrate Judge
Western District of Arkansas

## ATTACHMENT A

### DESCRIPTION OF THE PROPERTY TO BE SEARCHED

The property to be searched is hereinafter referred to as the "SUBJECT PREMISES". The SUBJECT PREMISES is located at 315 South Hughey St., in Waldo, Columbia County, Arkansas, in the Western District of Arkansas. The SUBJECT PREMISES is situated on the west side of Hughey St., which runs north and south, between McKissack St. and King Street. The SUBJECT PREMISES contains and includes a singlewide mobile home with tan siding and white window trim. A photo of the residence situated on the SUBJECT PREMISES follows:



The SUBJECT PREMISES includes the above-described and depicted residence, all rooms within the above-described residence, and any areas, closets, cabinets, safes, containers located therein.

The SUBJECT PREMISES also includes: 1) the curtilage of the above-described residence, 2) the entire parcel of real property on which the residence is situated (including any portion thereof which is not within the curtilage of the above-described residence), 3) any driveway, path, sidewalk, or other means of physical access to any part of the parcel of real property on which the above-described residence is situated, and 4) any and all any sheds, garages, outbuildings, vehicles, or containers located within the above-described areas, or which are apparently associated with the above-described residence.

## **ATTACHMENT B**

**ITEMS TO BE SEARCHED FOR AND SEIZED**

1. The items to be searched for and seized include any and all documents, records and property (whether physical or stored in electronic or digital form) that constitute or contain, or that may reasonably constitute or contain, evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and/or 846 (Distribution of, and Possession with Intent to Distribute, Controlled Substances, Use of a Communication Facility in the Distribution of Controlled Substances, and Attempts and Conspiracy commit the aforementioned offenses), including, but not limited to, the following:

   A. Buyer lists, seller lists, ledgers, or financial records relating to the purchase, sale, or distribution of controlled substances, and drug paraphernalia including but not limited to weight scales, cutting agents and packaging material;

   B. Books, records, receipts, notes, bank statements, and other bank records, money drafts, letters of credit, money orders, cashier's checks, and other monetary instruments, passbooks, bank checks, safe deposit box keys and records, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of proceeds from the sale of controlled substances; items providing evidence pertaining to money laundering, and documentation indicating the expenditure of the proceeds of narcotics distribution to acquire assets including but not limited to the purchase of vehicles, clothing, furniture, and electronic equipment;

   C. U.S. currency and currency equivalents such as cashier's checks, traveler's checks, money orders, and bank drafts, or precious metals, diamonds, gemstones, jewelry and other types of valuable items that may be deemed proceeds from drug trafficking and/or involved in money laundering;

   D. Indicia of occupancy, residency, and/or ownership of property including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

   E. Papers, tickets, notes, schedules, receipts, and other items relating to domestic or international travel;

   F. Photographs in paper or digital form and/or videos of the subjects of the investigation, co-conspirators, assets, or controlled substances;

    G. Cellular telephones, pagers, or other electronic devices or documents which reflect names, addresses, telephone numbers, contact information, correspondences, text messages and or emails of subjects of the investigation, their criminal associates, sources of supply, customers, and financial institutions;

    H. Counter-surveillance equipment;

    I. Any and all other documentary or record evidence of violations of one or more of the above-referenced statutes.

2. During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.